LONDON-SAVANNAH NAVAL STORES CO. v. SOUTH ATLANTIC S. S. LINE.

(District Court, S. D. Georgia, E. D.    March 21, 1918.)

1. SHIPPING ☞104—CONTRACTS—CONSTRUCTION.

Words used in a mercantile contract for affreightment by water of a designated cargo should be given a meaning as used in the mercantile sense.

2. SHIPPING ☞108—CONTRACTS—BREACH—"LIBERTY TO CALL."

Where a contract for affreightment of a designated cargo from Florida to England, by reference to the ocean bill of lading of the vessel, gave the vessel the liberty to call at any port or ports in or out of the customary route, the carrier's refusal to accept the cargo, except with the understanding that it reserved the option of forwarding the same via a continental port, should it prove necessary, was a breach, for the "liberty to call" is restricted to ports lying in or near the usual and direct course of the voyage, and there was an attempt on the part of the carrier to ingraft on the contract an additional term.

3. SHIPPING ☞104—CONTRACTS—MODIFICATION.

The terms of a contract for affreightment by water cannot be changed, save by evidence of a general custom or usage, which by implication must be deemed to have entered into the contract.

4. SHIPPING ☞104—CONTRACTS—BREACH.

Where a carrier by water breached its contract of affreightment, libelant is entitled to recover the increased cost of freight, the expense of storage, and the cost of fire protection until a bottom could be procured.

In Admiralty. Libel in personam by the London-Savannah Naval Stores Company against the South Atlantic Steamship Line. Decree for libelant.

Garrard & Gazan, of Savannah, Ga., for plaintiff.
Adams & Adams, of Savannah, Ga., for defendant.

BEVERLY D. EVANS, District Judge. The action is to recover damages for a breach of contract. On the trial it appeared that the libelant entered into three contracts, of the same tenor and effect, with the respondent, by which respondent agreed to furnish freight room for designated cargo at a stipulated charge for August, 1914, shipment; cargo to be delivered to respondent at Pensacola, Fla., and to be carried to Bristol, England, subject to conditions printed on the back of the contract. One of the conditions was that the contract was subject to the clauses and conditions in the ocean bill of lading used by the vessel. The bill of lading provided that the ship shall have the liberty "to call at any port or ports in or out of the customary route, in any order, to receive or discharge coal, cargo, passengers, or for any other purpose." On August 8, 1914, libelant at the request of respondent sent a cable message to its buyer at Bristol as follows: "Will you permit shipment Pensacola Bristol via Antwerp steamer Twilight"—who replied: "Via Antwerp impossible. Suggest defer shipment September-October." Similar request by cable was made of the buyer of the cargo destined to London, who replied: "Can only insure war risks steamers not sailed. Cannot permit shipments United Kingdom via Antwerp." This

cable correspondence was communicated to the respondent. On August 10, 1914, respondent transmitted to libelant two letters reading, respectively:

"Pensacola-Bristol: We herewith beg to tender you the S/S Twilight, now at Pensacola ready to load, under the above engagement, with the understanding that we reserve the option of forwarding this cargo via a continental port should it prove necessary. Kindly give your Pensacola office instructions to order this cargo out promptly and oblige." .

"Pensacola-London: We herewith beg to tender you the S/S Uganda, now at Sand Key awaiting orders, under the above engagement, with the understanding that we reserve the option of forwarding this cargo via continental port should it prove necessary. Kindly give your Pensacola office instructions to order this cargo out promptly and oblige."

Reply was made to these letters by libelant on same day, as follows:

"We have your letters of this date tendering us the steamers Uganda for London and Twilight for Bristol, but beg to say that we cannot accept same with your reserving the option of forwarding these cargoes via a continental port. Such reservation is contrary to usance, besides which it is not provided for in your freight contracts with us, and we must therefore insist upon your providing us an unrestricted U. K. voyage. Furthermore we would remind you that you agreed with our Mr. Jensen to give one week's notice of steamers' readiness to sail."

On the next day respondent wrote libelant:

"Engagement 3000 B/Rosin and 3000 B/Turps. August shipment Pensacola/Bristol. We are in due receipt of your yesterday's favor notifying us that you decline to make delivery to the S. S. Twilight under our contract with you, which gives us the option of forwarding direct or via a continental port. Under these circumstances we are compelled to look upon the contract as canceled, and are taking action accordingly, which please note."

Subsequently and with due dispatch libelant procured in open market on the best terms possible space in another vessel at an advanced rate, and the cargo was shipped to Bristol.

[1, 2] The fundamental difference between the parties arises out of the construction to be given to the "liberty to call" provision of the contract. This is a mercantile contract, and the words employed therein are to be given a meaning as used in the mercantile sense. The parties were contracting for the voyage of a cargo, and it is fair to both of them to view their expressions in the contract as being in furtherance of the voyage and the delivery of the cargo, rather than give such expressions an unreasonable signification, or a meaning out of harmony with the true intent of the parties as revealed in the contract. In the early maritime cases a general liberty to call at any port was restricted to ports lying in or near the usual and direct course of the agreed voyage. Carver on Carriage by Sea, § 286. In an English case decided in 1888 (Leduc v. Ward, 20 Q. B. D. 475, 6 N. S. Aspinall's Rep. of Maritime Cases, ——) the bill of lading reserved "liberty to call at any ports in any order and to deviate for the purpose of saving life or property." Instead of proceeding direct to Dunkirk, the ship went first to Glasgow, out of her course, and was lost; and it was held that the shipowners were not protected by the clause giving liberty to call. The principles enunciated in Leduc v. Ward were reaffirmed and followed in Margetson et al. v. Glynn et al., 7 N. S. Aspinall's Report of

Maritime Cases, 148. In that case oranges were shipped by the plaintiffs on a steamer of the defendants at Malaga for conveyance to Liverpool under a bill of lading with the provision:

"Shipped * * * upon the Zena, now lying in the port of Malaga and bound for Liverpool, with liberty to proceed to and stay at any port or ports in any rotation in the Mediterranean, Levant, Black Sea, or Adriatic, or on the coasts of Africa, Spain, Portugal, France, Great Britain, and Ireland, for the purpose of delivering coals, cargo or passengers, or for any other purpose whatsoever."

On leaving Malaga the steamer, instead of sailing directly to Liverpool, proceeded to a port in Spain about two days' voyage from Malaga, in the contrary direction of Liverpool. Owing to the delay, the oranges were damaged when they arrived at Liverpool. It was held that the general words in the deviation clause must be construed with reference to, and limited by, the voyage agreed upon, and would only justify a deviation to any port fairly on the course of the agreed voyage.

In Swift v. Furness et al. (D. C.) 87 Fed. 345, the bill of lading contained a clause, "with liberty to sail with or without pilots, to make deviation, and to call at any intermediate port or ports for any purpose," and this was construed to permit only such departures from the voyage as might be reasonable and necessary.

The rationale of the principle recognized in the cited cases, as well as others examined by me, is that where general words are used in a contract of affreightment, and are intended to be made applicable to the circumstances of the particular contract, the main object and intent of the particular contract are to be looked at, and the general words are to be limited to that view. Applying this principle to the construction of the contract sub judice, it is manifest that the parties contemplated a carriage of the cargo on a voyage from Pensacola, Fla., to Bristol, England, and that the general words of the clause giving liberty to call "at any port or ports, in or out of the customary route, in any order," must be considered as limited by the contemplated voyage from Pensacola to Bristol, and only justifying a deviation to any port fairly on the course of the agreed voyage.

We come, now, to a consideration of the correspondence between the parties, to determine whether there was a demand on the part of the respondent to ingraft an additional term in the contract by its letter of August 10th, wherein it offered to accept the cargo "with the understanding that we reserve the option of forwarding this cargo via a continental port, should it prove necessary." The respondent's insistence is that this language of its letter was not intended, nor could it be understood as so intending, as making any change in the deviation clause of the contract. It contends that the letter was prompted by conditions produced by the European war, which had just begun, many shippers being uncertain as to the effect of the war on contracts of this kind; that libelant had put it on notice that it considered all continental contracts were canceled, and under these circumstances respondent was apprehensive there might be some objection if a vessel touched a continental port. Respondent had continental contracts, and,

in making the tender, wished to make it clear that it insisted on its contract, which under its interpretation reserved to it the option of forwarding the cargo via a continental port, should it prove necessary. On the other hand, the libelant takes the position that the contract did not permit a deviation to continental ports, but that the contract called for a voyage from Pensacola to Bristol, and that no deviation was permissible to a continental port, if such was not fairly on the course of the agreed voyage.

According to my construction of the contract, the liberty of call clause did not permit an absolute deviation to all or any particular continental ports. The only ports at which the vessel was at liberty to call were such as were fairly on the course of the agreed voyage from Pensacola to Bristol. Hence the tender, made with the understanding that respondent reserved an option of forwarding the cargo by a continental port imported a new term, viz. the option to call at a continental port deemed to be necessary, without regard to its location with respect to the course of the agreed voyage. The libelant had the legal right to reject such tender. The statement in the letter declining to accept tender, with the condition named, on the ground that the reservation was contrary to "usance," and not provided for in the contract, and therefore it must insist on an unrestricted U. K. voyage, will not excuse the tender required by the contract. The respondent attached no importance to that sentence in the letter, because in its letter of the 11th it expressly states that it canceled the contract because libelant declined to make delivery to the vessel under the contract which gave them an option to forward by a continental port. The subsequent letter of libelant throws no additional light on the subject. I am therefore of the opinion that respondent did not make a tender of its vessel in terms of the contract, and, having voluntarily declared the contract to be canceled, the libelant could proceed as for breach of contract.

[3] The respondent further insists that the evidence discloses that it was not unusual to make the voyage from Pensacola to Bristol, touching at a continental port en route the voyage. But the evidence falls short of showing a general custom or usage of trade sufficient to authorize a conclusion that any such custom or usage by implication entered into the contract. The contract as made by the parties must control.

[4] As to the amount of damages recoverable: I think that libelant is entitled to recover the increased cost of freight, the expense of storage, and the cost of fire insurance protection until a bottom could be procured. These items total $2,397.94, and I award this amount as damages resulting from a breach of the contract.

Leave is granted to the proctor of libelant to enter up judgment for this amount, with costs, according to the practice and law in such cases.